MICHIGAN ASSOCIATION OF PSYCHOTHERAPY CLINICS v
BLUE CROSS AND BLUE SHIELD OF MICHIGAN

MIDWEST MENTAL HEALTH CLINIC, PC v BLUE CROSS AND
BLUE SHIELD OF MICHIGAN

Docket Nos. 45750, 45751. Submitted May 19, 1980, at Detroit.—
Decided November 19, 1980.

Blue Cross and Blue Shield of Michigan has, for several years,
reimbursed outpatient psychiatric clinics for treatment pro-
vided to subscribers. The reimbursement is made pursuant to
participation agreements entered into with the clinics. In 1979,
Blue Cross notified those clinics of a modification in its reim-
bursement rate structure and indicated that the new rates
would be effected by terminating the existing participation
agreements pursuant to a 60-day termination clause contained
in the agreements and by entering into new agreements con-
taining the new rates. The Michigan Association of Psychother-
apy Clinics and several others, and Midwest Mental Health
Clinic, P.C., brought actions against Blue Cross seeking injunc-
tive relief. The cases were consolidated and the Oakland Circuit
Court, James S. Thorburn, J., permanently enjoined Blue Cross
from enforcing the new rate structures and ordered the contin-
uation of the existing participation agreements, holding that
the new agreements were in violation of Federal antitrust laws.
Blue Cross appeals, alleging that the trial court was without

REFERENCES FOR POINTS IN HEADNOTES
[1] 20 Am Jur 2d, Courts §§ 12, 13.
　54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
　　Practices §§ 261, 263.
[2] 20 Am Jur 2d, Courts § 139.
[3] 32 Am Jur 2d, Federal Practice and Procedure § 43.
　What actions arise under Constitution, laws, and treaties of United
　　States; general principles. 12 ALR2d 5.
[4] 20 Am Jur 2d, Courts § 67.
　76 Am Jur 2d, Trial § 1252.
[5] 44 Am Jur 2d, Insurance § 1627.
[6-8] 17 Am Jur 2d, Contracts §§ 21, 192, 242.
[9] 5 Am Jur 2d, Appeal and Error § 726.
　32 Am Jur 2d, Federal Practice and Procedure § 387.

jurisdiction to decide whether the agreements violated the Federal laws and that the trial court erred by holding that the agreements invade the physician-patient relationship and by finding the 60-day termination clause of the existing agreements to be unreasonable. *Held:*

1. While actions to restrain violations of Federal antitrust laws must be brought in Federal court, the present action was not based on such violations. It was an action in contract with no allegations that the contract was intrinsically violative of the Federal laws. Therefore, the trial court was not without jurisdiction to pass upon the antitrust violation question.

2. The trial court, which sat without a jury, failed to state on the record the facts upon which it based its holding that the new agreements violated the Federal antitrust laws. The Court of Appeals will not pass on the issue without a more complete record, and the case is remanded for preparation and certification of findings of fact.

3. The new agreements do not invade the physician-patient relationship. Blue Cross is not free to impose restrictions as to methods of diagnosis or treatment, but is also not required to *reimburse for all methods of diagnosis and treatment.*

4. The 60-day termination provision of the existing agreements is not unreasonable.

Remanded for findings of fact.

1. COURTS — ANTITRUST ACTIONS — FEDERAL COURTS.

Actions to restrain violations of Federal antitrust law must be brought in Federal court.

2. COURTS — JURISDICTION — SUBJECT MATTER JURISDICTION.

Subject matter jurisdiction may not be conferred upon a court by stipulation of the parties.

3. COURTS — JURISDICTION — ANTITRUST ACTIONS — STATE COURTS.

The exclusive jurisdiction of the Federal courts over actions brought for violation of the Federal antitrust law does not deprive a state court of jurisdiction to hear and pass upon an alleged violation of the Federal law where the issue is raised as a collateral matter in an action which is based on contract.

4. APPEAL — FAILURE TO FIND FACTS — COURT RULES.

Failure of a trial court to find the facts specially and to state its conclusions thereon may result in reversal by the Court of Appeals regardless of whether the issue is raised by the parties;

the mere statement of the court's ultimate findings and conclusions is not sufficient (GCR 1963, 517.1).

5. HEALTH — MEDICAL CARE CORPORATIONS — RESTRICTIONS ON PHYSICIANS — STATUTES.

A nonprofit medical care corporation may not impose restrictions upon physicians as to methods of diagnosis or treatment of subscribers, but is not required to reimburse medical care providers for all methods of diagnosis and treatment (MCL 550.310, 550.312[2]; MSA 24.600, 24.602[2]).

6. CONTRACTS — COURTS — TERMS OF CONTRACTS.

A court has no authority to change the terms of a contract merely because the court feels that it was an unwise contract for a party to have entered into.

7. CONTRACTS — UNEQUAL BARGAINING POWER — ENFORCEMENT OF CONTRACT TERMS.

The fact that parties to an agreement have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced.

8. CONTRACTS — UNREASONABLE TERMS.

The question of whether or not a contractual provision is substantively unreasonable or unconscionable depends on the commercial setting, purpose and effect of the provision.

9. APPEAL — CLAIM NOT DECIDED BELOW.

A claim which did not control the disposition of a case in the lower court and which, in fact, was not passed upon by the lower court need not be determined on appeal.

*Goodenough, Smith & May* (by *Delmer C. Gowing, III),* for the Michigan Association of Psychotherapy Clinics.

*Bushnell, Gage, Doctoroff, Reizen & Byington* (by *Noel A. Gage, Mark E. Reizen* and *Lynn H. Shecter),* for Midwest Mental Health Clinic, P.C.

*Michael T. Zajac,* for defendant.

Before: D. E. HOLBROOK, JR., P.J., and V. J.
BRENNAN and S. EVERETT,* JJ.

V. J. BRENNAN, J. Defendant Blue Cross and
Blue Shield of Michigan appeals from a nonjury
trial on stipulated facts and exhibits. Following
trial, defendant was permanently enjoined from
enforcing a substitute participation agreement as
to outpatient psychotherapy clinics involved in the
action.

The facts which give rise to this dispute can be
summarized as follows. Since 1966, defendant has
offered its subscribers outpatient psychiatric bene-
fits. This has led to increased demand for treat-
ment and a concomitant increase in the number of
outpatient psychotherapy clinics. In order for out-
patient psychotherapy clinics to be eligible for
reimbursement for services rendered to patients
insured by defendant Blue Cross and Blue Shield,
these clinics must be approved by Blue Cross and
Blue Shield. Plaintiffs Midwest Mental Health
Clinic and the member clinics of Michigan Associa-
tion of Psychotherapy Clinics were such approved
clinics.

Originally, defendant reimbursed psychiatrists,
psychologists, social workers and other profession-
als at an average rate of $40 per treatment ses-
sion. On February 23, 1979, Blue Cross and Blue
Shield notified its participating clinics of modifica-
tions to its reimbursement policy to take effect
May 1, 1979. This modification was to be effected
by invoking a 60-day termination at will provision
in defendant's participation agreements with the
98 clinics, and by offering the clinics new partici-
pation agreements.[1] Under the new agreements,

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] The existing form contracts provided, in part, that:

"The parties agree that this agreement may be terminated without

the single rate structure would be replaced by a differential rate structure.[2] Reimbursement would continue until December 31, 1979, for treatment begun before February 26, 1979.

On appeal defendant raises six issues. The first issue is one of jurisdiction.

At the end of trial, the court permanently enjoined Blue Cross and Blue Shield from enforcing the May 1, 1979, modifications to the OPC Program Agreement and ordered the participation agreement in effect through April, 1979, continued until further order of the court. The trial judge reasoned as follows:

"The contracts before and after May 1st are not insurance contracts, but are merely arrangements for the purchase of services to perfect cost savings and are subject to the strictures of the Sherman Act. The May 1st contract will effectively 'fix prices and restrain trade' in violation of the Sherman Act and is within the jurisdiction of this Court for the purposes of enjoining such unlawful action upon the part of the Defendant."

Defendant-appellant Blue Cross and Blue Shield argues that the trial court's ruling constitutes fundamental error with respect to the circuit court's subject matter jurisdiction as well as an erroneous application of an antitrust "price fixing" proscription. Appellant contends that state courts lack subject matter jurisdiction over a cause of action based on Federal antitrust laws and that exclusive jurisdiction is in the Federal courts.

cause by either party on the day following a previous written notice to the other party of at least sixty (60) days."

[2] The new rate structure would reimburse psychiatrists up to $49 per treatment session; psychologists up to $41 per treatment session; and social workers with a master's degree in social work up to $33 per treatment session. Treatment performed by persons not in these three categories would not be reimbursed.

They further contend that lack of subject matter jurisdiction cannot be waived or avoided by stipulation of the parties.

Plaintiffs Midwest and Michigan Association of Psychotherapy Clinics do not dispute that an antitrust action must be brought in the Federal courts. They argue, however, that they have neither based their action upon nor sought relief under Federal antitrust laws. Rather, they argue that the complaint sounded on the unconscionability of a contract term in violation of state statutes and that under these circumstances, the courts of Michigan do have jurisdiction over original actions based on state law where a violation of Federal antitrust law is raised collaterally.

Actions to restrain violations of Federal antitrust law must be brought in Federal court. *General Investment Co v Lakeshore & M S R Co,* 260 US 261; 43 S Ct 106; 67 L Ed 244 (1922), *Barnes v Dairymen's League Co-op Ass'n, Inc,* 220 App Div 624; 222 NYS 294 (1927). Moreover, subject matter jurisdiction may not be conferred by stipulation of the parties. *Shane v Hackney,* 341 Mich 91, 98; 67 NW2d 256 (1954), *Eggermont v City of Clawson,* 88 Mich App 246, 248; 276 NW2d 574 (1979).

In some cases, however, defendants have been allowed to raise Federal antitrust defenses to contract actions in state courts. See *General Analine & Film Corp v Bayer Co,* 305 NY 479; 113 NE2d 844 (1953), *Vendo Co v Stoner,* 105 Ill App 2d 261; 245 NE2d 263 (1969), *Lyons v Westinghouse Electric Corp,* 222 F2d 184 (CA 2, 1955).

In *Lyons, supra,* Westinghouse brought a breach of contract action in state court in which Lyons had raised a violation of Federal antitrust law as an affirmative defense. Lyons then brought an action in Federal court based on alleged Federal

antitrust violations. One of the issues thus confronting the Federal court was whether the state court had jurisdiction to entertain the Federal antitrust claims. The court held that while the state court's findings were not res judicata in the Federal courts, the state court could in fact adjudicate Federal antitrust claims raised collaterally to settle the other issues raised:

"Nor is there anything inconsistent with this in allowing violations of the Acts to be raised as valid defenses to actions brought in state courts * * * if it involves a partial enforcement of an undertaking itself forbidden." 222 F2d 184, 190.

Two state courts have directly upheld the state court's application of Federal antitrust laws in fairly adjudicating a contract action before it. In *Vendo, supra,* the action was for breach of contract, and Federal antitrust violation was alleged as a defense. The court held that the mere fact that a defense is predicated on Federal statute does not, by itself, deprive the state court of jurisdiction to hear and pass upon the defense. A similar result was forthcoming in *General Analine & Film Corp, supra,* wherein defendant raised violations of Federal antitrust laws as a defense in an action for breach of contract.

In *Overseas Motors, Inc v Import Motors Ltd, Inc,* 375 F Supp 499 (ED Mich, 1974), *aff'd* 519 F2d 119 (CA 6, 1975), the court dealt with an appeal from a Swiss Court of Arbitration. In addressing whether the findings of the Court of Arbitration constituted res judicata, Judge Feikens of the district court addressed the antitrust and contract issues as follows:

"Claims arising under the antitrust laws are within

the exclusive jurisdiction of the federal courts. They are not subject to arbitration and no res judicata *qua* claim preclusion could be based on any such proceeding. As this court has previously determined, the questions submitted to the Zurich court of arbitration were not in the nature of antitrust claims. That cause of action was bottomed on contract, and in the absence of allegations that the contract itself was intrinsically violative of the antitrust laws, such actions are not preempted by this court's exclusive authority over them. Conversely, an adverse judgment in that case is no bar to maintenance of antitrust claims arising out of the same transactions. (Citations deleted.) 375 F Supp 499, 518.

As in *Lyons, Vendo* and *General Analine,* the instant case was not premised on a charge of violation of Federal antitrust laws. The complaint was grounded on breach of contract, unconscionability of contract, interference with the practice of medicine, equitable estoppel, tortious interference with advantageous business relationships and restraint of trade and/or price fixing under Michigan antitrust laws. Since the cause of action was bottomed on contract and there were no allegations that the contract itself was intrinsically violative of antitrust laws, we find the judge's ruling was not preempted by the Federal court's exclusive jurisdiction over antitrust actions. *Overseas Motors, Inc, supra.* The mere fact that the antitrust violation raised by the judge is predicated on the Federal statute did not deprive the state court of jurisdiction to hear and pass upon it.

Defendant's next argument is inextricably related to its first: that is, that the trial court erred by holding that the participation agreements to take effect May 1, 1979, would fix prices and restrain trade in violation of Federal antitrust law.

GCR 1963, 517.1 requires the trial court to find

the facts specially and state separately its conclusions thereon.[3] Since clear and complete findings are essential to this Court for the exercise of its appellate function, failure to comply with the rule can result in reversal regardless of whether the issue is raised by the parties. *Nicpon v Nicpon,* 9 Mich App 373; 157 NW2d 464 (1968). The mere statement of the court's ultimate findings and conclusory language are not sufficient to comply with the rule. As our Supreme Court succinctly stated in *Ray v Mason County Drain Comm'r,* 393 Mich 294, 302; 224 NW2d 883 (1975):

"What is required under GCR 1963, 517 will vary somewhat with the type of case and the nature of the fact questions involved, but at the very least GCR 1963, 517 demands that the court's findings be sufficiently detailed to give an indication of the factual basis for the judge's conclusion. Honigman & Hawkins, respected commentators on Michigan laws of procedure, making the following observations with regard to the requirements of GCR 1963, 517:

" 'The findings of fact must include as much of the subsidiary facts as is necessary to disclose the steps by which the trial court reached its ultimate conclusion on each factual issue. The findings should be made at a level of specificity which will disclose to the reviewing

---

[3] GCR 1963, 517.1 provides as follows:

"In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the fact specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment. It will be sufficient if the court makes brief, definite, and pertinent findings and conclusions upon the contested matters without over elaboration of detail or particularization of facts. If an opinion or memorandum decision is filed, it will be sufficient if the findings and conclusions appear therein. The clerk shall notify the attorneys for both parties of the findings of the court. Findings of fact and conclusions of law are unnecessary on decisions of motions except as provided in subrule 504.2. Requests for findings are not necessary for purposes of review. No exception need be taken to any finding or decision. Findings of fact shall not be set aside unless clearly erroneous. In the application of this principle regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it."

court the choices made as between competing factual premises at the critical point that controls the ultimate conclusion of fact. That is, at the point where a given choice as to the concrete facts leads inevitably to the ultimate conclusion, the findings should disclose the choice which was made, so that the appellate court may test the validity of its evidentiary support.' 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 594."

In the instant case the court merely said that the contract would "fix prices and restrain trade". What this Court needs to know is *how* the contract would fix prices and restrain trade. The trial court also made no findings as to whether these contracts involved interstate commerce, a necessary element for making out a cause of action under the Sherman Antitrust Act. See 15 USC 1.

In concluding that implementation of the modified participation agreements would fix prices and restrain trade the trial court relied on *Group Life & Health Ins Co v Royal Drug Co,* 440 US 205; 99 S Ct 1067; 59 L Ed 2d 261 (1979).

In *Royal Drug,* 18 owners of independent pharmacies in San Antonio, Texas, brought an antitrust action in a Federal district court against the defendants, Group Life and Health Insurance Co, known as Blue Shield of Texas (Blue Shield), and three pharmacies also doing business in San Antonio. The complaint alleged that the defendants had violated § 1 of the Sherman Act, 15 USC 1 *et seq.,* by entering agreements to fix the retail prices of drugs and ·pharmaceuticals, and that the activities of the petitioners had caused Blue Shield's policyholders not to deal with certain of the plaintiffs, thereby constituting an unlawful group boycott.

The facts which gave rise to that case can be

summarized as follows. Blue Shield offered insurance policies which entitled policyholders to obtain prescription drugs. If the insured selected a pharmacy which had entered into a "Pharmacy Agreement" with Blue Shield, and was therefore a participating pharmacy, the insured was required to pay only $2 for every prescription drug. If, on the other hand, the insured selected a pharmacy which had not entered into a Pharmacy Agreement, and was therefore a nonparticipating pharmacy, he was required to pay the full price charged by the pharmacy. The insured could then obtain reimbursement from Blue Shield for 75% of the difference between that price and $2.

Blue Shield offered to enter into a Pharmacy Agreement with each licensed pharmacy in Texas. Under the Agreement, a participating pharmacy agreed to furnish prescription drugs to Blue Shield's policyholders at $2 for each prescription, and Blue Shield agreed to reimburse the pharmacy for the pharmacy's cost of acquiring the amount of the drug prescribed. Thus, only pharmacies that could afford to distribute prescription drugs for less than the $2 markup could profitably participate in the plan.

The trial court granted summary judgment to the defendants on the ground that the challenged agreements were exempt from the antitrust laws under § 2(b) of the McCarran-Ferguson Act, 59 Stat 34, as amended, 61 Stat 448; 15 USC 1012(b) because the agreements were the "business of insurance", were regulated by Texas law, and were not "boycotts" within the meaning of § 3(b) of the act, 59 Stat 34; 15 USC § 1013(b). *Royal Drug Co v Group Life & Health Ins Co,* 415 F Supp 343 (WD Tex, 1976). The Court of Appeals for the Fifth Circuit reversed, holding that the agreements in

question were not the "business of insurance" within the meaning of § 2(b) of the act. *Royal Drug Co v Group Life & Health Ins Co,* 556 F2d 1375 (CA 5, 1977). The United States Supreme Court granted certiorari to consider whether the Court of Appeals was correct in concluding that these Pharmacy Agreements were not the "business of insurance" within the meaning of § 2(b) of the Mc-Carran-Ferguson Act. *Group Life & Health Ins Co v Royal Drug Co,* 440 US 205; 99 S Ct 1067; 59 L Ed 2d 261 (1979).

The Supreme Court explained that the exemption carved out in the McCarran-Ferguson Act is for the "business of insurance" not the "business of insurers". Finding that the primary elements of an insurance contract are the spreading and underwriting of the policyholder's risk, the Supreme Court concluded that Blue Cross and Blue Shield's contract with its participating pharmacies served only to minimize the costs incurred by Blue Cross and Blue Shield in fulfilling its underwriting obligations and, as such, was not concerned with the spreading and underwriting of the policyholder's risk. Accordingly, the Pharmacy Agreements were not exempt from examination under the antitrust laws. The Court explicitly did not rule on the illegality of the Agreements. "Whether the Agreements are *illegal* under the antitrust laws is an entirely separate question not now before us." *Id.,* 210. In fact, the Court points out in fn 5: "It is axiomatic that conduct which is not exempt from the antitrust laws may nevertheless be perfectly legal. The United States in its *amicus* brief urging affirmance has taken the position that the Pharmacy Agreements probably do not violate the antitrust laws, though recognizing that that issue is not presented here." *Id.*

We recognize that the failure to comply with GCR 1963, 517.1, does not automatically require remand. *People v Cook,* 89 Mich App 72, 80-81; 279 NW2d 579 (1979). We believe that under the circumstances presented here this Court would be ill-advised to assume the responsibilities of fact-finding charged to the trial court. Accordingly, the original record is remanded to the trial judge "for preparation and certification of findings of fact". *Dauer v Zabel,* 381 Mich 555, 558; 164 NW2d 1 (1969).

Blue Cross and Blue Shield also charges as error the trial court's holding that the May 1, 1979, participation agreement invades the physician-patient relationship and usurps a psychiatrist's control over the practice of mental health care. Blue Cross and Blue Shield reasons that MCL 550.312(2); MSA 24.602(2) permits it to provide payment for all, some or none of the health care services received by its subscribers. The contract determines what payments are made for which services.

The plaintiffs argue that the May 1, 1979, participation agreement requires each clinic to employ a psychiatrist to assume overall responsibility for patient care, attempts to regulate the practice of those psychiatrists by defining those categories of therapists to whom the psychiatrist might delegate aspects of treatment, and interferes with the free choice of doctors by patients, since patients would be forced to choose psychiatrists whose practice conforms to defendant's standards or to forego benefits.

We find plaintiffs' argument unpersuasive.

MCL 550.310; MSA 24.600 provides:

"Each doctor of medicine, licensed and registered

under Act No 237 of the Public Acts of 1899, as amended, being sections 338.51 to 338.59 of the Michigan Compiled Laws, or each doctor of osteopathic medicine licensed under Act No 162 of the Public Acts of 1903, as amended, being sections 338.101 to 338.109 of the Michigan Compiled Laws, or each doctor of surgical chiropody or podiatry licensed and registered under Act No 115 of the Public Acts of 1915, as amended, being sections 338.301 to 338.308a of the Michigan Compiled Laws, or each doctor of chiropractic licensed and registered under Act No 145 of the Public Acts of 1933, as amended, being sections 338.151 to 338.159 of the Michigan Compiled Laws, practicing legally in this state shall have the right to register with the corporation for general or special medical care. A nonprofit medical care corporation shall not impose restrictions on the doctors of medicine, doctors of osteopathic medicine, or doctors of surgical chiropody or podiatry, or doctors of chiropractic, who treat its subscribers as to methods of diagnosis or treatment. The private physician-patient relationship shall be maintained and the subscriber shall at all times have free choice of doctor of medicine, doctor of osteopathic medicine, or doctor of surgical chiropody or podiatry, or doctors of chiropractic. An employee, agent, officer, or member of the board of directors of such a corporation who influences or attempts to influence a person in the choosing and selecting of his own physician, is guilty of a misdemeanor."

And MCL 550.312; MSA 24.602 provides in pertinent part:

"(1) The medical care rendered on behalf of a nonprofit medical care corporation shall be in accordance with the accepted medical practice in the community at all times.

"(2) For the purposes of this act a nonprofit medical care corporation *may furnish* as a benefit any health care by a person licensed or certified under Act No 185 of the Public Acts of 1973, as amended, * * *." (Emphasis added.)

While MCL 550.310 prohibits Blue Cross and Blue Shield from imposing restrictions on doctors of medicine who treat subscribers as to methods of diagnosis or treatment, MCL 550.312(2); MSA 24.602(2) provides that Blue Cross and Blue Shield is not required to reimburse for all methods of diagnosis and treatment.

Based on our reading of both these statutes, we do not believe that the May 1, 1979, participation agreement invades the physician-patient relationship. Physicians remain as unfettered under this new agreement as under the former to treat and diagnose patients in the manner they wish. We do not find that Blue Cross and Blue Shield's refusal to reimburse for treatment performed by social workers without a master's degree is the species of restriction intended by the Legislature in passing MCL 550.310. Doctors are still free to use social workers without master's degrees in their clinics. The only difference is the financial source to which they must now look for compensation.

Blue Cross and Blue Shield also argues that the court erred in finding the 60-day termination clause in the April, 1979, participation agreement unreasonable because it allowed defendant to "put a clinic out of business at a whim". We agree. The specific clause in question allowed either party to terminate the terms of the contract without cause upon 60 days written notice.[4]

We start our analysis with the general principle that individuals are fully competent to enter into any contract which they wish to enter into and may obligate themselves to perform in any manner provided the contract is not in violation of any penal laws or public policy of the state. The court has no authority to change the terms of a contract

4 See footnote 1, *supra.*

simply because it might feel that it was an unwise contract for a party to have entered into. *Mullally v Bey,* 15 Mich App 248; 166 NW2d 500 (1968).

Plaintiff relies upon *Allen v Michigan Bell Telephone Co,* 18 Mich App 632; 171 NW2d 689 (1969), to support its premise that the 60-day termination clause is unreasonable. In *Allen,* this Court refused to enforce a contract clause which limited the telephone company's liability for damages when it failed to publish plaintiff's advertisement in the yellow pages as it had contracted to do. This Court's primary concern in denying effect to the exculpatory clause was that plaintiff was contracting with a public utility which, in essence, had a monopoly on the type of advertising sought. There being no realistic alternative means for the plaintiff to communicate with the same audience which the yellow pages reaches, the Court found that the nonliability term was offered on a "take it or leave it" basis, that the term was unreasonable and, in effect, unconscionable. The Court concluded by stating:

"We believe the law in Michigan to be that, where goods or services used by a significant segment of the public can be obtained from only one source, or from limited sources on no more favorable terms, an unreasonable term in a contract for such goods or services will not be enforced as a matter of public policy." 18 Mich App 632, 640.

Plaintiffs point to *Allen* and argue that based on the disparity in bargaining power between the individual clinics and Blue Cross and Blue Shield, the 60-day termination clause was unreasonable.

We disagree. The fact that parties to an agreement "have different options or bargaining power,

unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced". 18 Mich App 632, 638.

Our review of the facts and circumstances of this case do not persuade us that the 60-day notice of termination was unreasonable. Although plaintiffs make much of their allegations that the 60-day termination will in effect put plaintiffs out of business, we are not so persuaded. We note that plaintiffs will now be reimbursed $4 more per psychiatric treatment session, and $1 more per psychologist treatment session, than under the prior agreement. Moreover, plaintiffs can continue to utilize social workers without master's degrees in social work. The only difference is that plaintiffs will now be required to look to their patients instead of Blue Cross and Blue Shield for reimbursement. Whether a contractual provision is substantively unreasonable or unconscionable depends on the commercial setting, purpose and effect of the provision. *Reed v Kaydon Engineering Corp,* 38 Mich App 353; 196 NW2d 487 (1972). While a two-year termination provision might have been preferable, it is not the court's place to rewrite the parties' agreement.

Finally, we note the factual distinctions between *Allen* and the instant case. In *Allen* plaintiff could not get a comparable "Yellow Pages" listing from any other source. In the instant case, although Blue Cross and Blue Shield is a major health insurer in Michigan, it is not the only health insurer. And most significantly, defendant in *Allen* was attempting to exculpate itself from its own negligence, a position generally closely scrutinized. Such is not the case here.

We do not address the last two allegations of error.

Defendant claims that the May 1, 1979, participation agreement did not violate Michigan antitrust law, MCL 445.701 *et seq.;* MSA 28.31 *et seq.* Plaintiff, Midwest Mental Health Clinic, argues that defendant's new reimbursement policy constitutes tortious interference with plaintiff's contractual and advantageous business relationships.

The trial court did not discuss or refer to Michigan antitrust law, or to tortious interference with contractual relationships. A claim which did not control the disposition of the case in the lower court and in fact was not passed on at all need not be determined on appeal. *Bentley v Shifflet, Cumber & Co,* 238 Mich 5, 9-10; 213 NW 152 (1927).

Remanded for findings of fact as to the questions of restraint of trade and price fixing only, the other issues raised having been disposed of in this opinion.

We retain jurisdiction.